# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CARISSA LANNING,

    Plaintiff,

  v.         Case No. 19-CV-890

GATEWAY TECHNICAL COLLEGE,

    Defendant.

## DECISION AND ORDER GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1. Background

In the Spring of 2016 Carissa Lanning enrolled as a student at Gateway Technical College, a post-secondary technical college that is part of the Wisconsin Technical College System. (ECF No. 59, ¶¶ 1-3[1].) In December of 2016 Gateway hired her as a

---

[1] In responding to Gateway's proposed findings of fact, Lanning often offers additional information without providing any citation for her additional statement. (*See, e.g.*, ECF No. 59, ¶ 1 (noting, without citation, "Plaintiff further states that Gateway receives federal funding.") As to other proposed findings of fact her response seems to suggest that she disputes the proposed finding of fact, but she does not explicitly say so. Instead, she merely offers an unsupported assertion. (*See, e.g.*, ECF No. 59, ¶ 45.) Any additional fact offered only in response to a proposed finding of fact is disregarded. *See Pollock v. ManpowerGroup US, Inc.*, No. 18-CV-107, 2019 U.S. Dist. LEXIS 199665, at *7-8 (E.D. Wis. Nov. 18, 2019). Any response to a proposed finding of fact that it unsupported by any citation to the record is disregarded and the proposed facts is deemed admitted. *See* Fed. R. Civ. P. 56(e)(2). Unless otherwise noted, the court's recounting of facts here reflects its conclusion that the fact is undisputed.

"student casual" employee in its information technology (IT) department. (ECF No. 59, ¶¶ 27-29.) It provided her with a letter of employment indicating a term of employment from December 12, 2016, through August 30, 2017. (ECF No. 59, ¶¶ 28-29.) In August of 2017 Gateway tendered to Lanning a second employment letter, extending her employment through 2017. (ECF No. 59, ¶ 35.) These letters identified Lanning's supervisor as IT Director Eric Doherty and Lanning's contact person as Technology Support Coordinator Marvin Campbell. (ECF No. 59, ¶¶ 24, 25, 30, 36.)

As a student casual Lanning worked with Computer Support Technicians Felicia Edwards, Calvin Harris, and Assad Assad (ECF No. 59, ¶ 41), each of whom could assign tasks to the student casual employees (ECF No. 64, ¶ 4). Lanning alleges that during her employment she was repeatedly subjected to sexually harassing and assaultive behavior from Assad. In March of 2017 Assad commented on Lanning needing to pump breastmilk at work and stated that she should be at home with her child rather than at work. (ECF No. 59, ¶ 82.) He commented that Lanning had a "nice ass" (ECF Nos. 64, ¶ 23; 59, ¶ 84), and beginning in the summer of 2017 he would slap and squeeze her buttocks (ECF No. 59, ¶ 85; *see also* ECF No. 64, ¶ 24).

In the fall of 2017 Assad sent Lanning a Snapchat photograph of his genitals. (ECF Nos. 59, ¶ 91; 64, ¶ 28.) Assad also touched Lanning's breasts and genital area over her clothing (ECF No. 64, ¶¶ 25-26), and once attempted to reach under her shirt and into her pants, which Lanning prevented (ECF No. 64, ¶ 27). (ECF No. 59, ¶ 92.) Around

October 26, 2017, Asad told Lanning that one day he was going to tie her down and rape her. (ECF No. 59, ¶ 93.) A few days later, Lanning observed Assad looking at guns and ammunition on his work computer. (ECF No. 59, ¶ 94.)

These events—Assad's rape threat and him viewing weapons—led Lanning to report Assad's sexual harassment to her fiancé on November 2, 2017. (ECF No. 59, ¶ 96.) The same day Lanning contacted the Racine Police Department and reported Assad's conduct. (ECF No. 59, ¶ 101.)

Also on November 2, 2017, Lanning reported the harassment to her fiancé's mother, Clarista Phifer, who was an instructor at Gateway. (ECF No. 59, ¶¶ 97-98.) Phifer contacted Gateway's Dean of Service Occupations, Terry Simmons. (ECF No. 59, ¶ 99.) Simmons, in turn, contacted Gateway's Associate Vice President of Facilities and Security, Tom Cousino, who immediately reported the alleged conduct to Debbie Miller, Gateway's Title IX Coordinator. (ECF No. 59, ¶ 100.)

The next day, Gateway's Compliance Manager, Josh Vollendorf, began an investigation into Lanning's complaint (ECF No. 59, ¶ 108), the first step of which was to interview Lanning (ECF No. 59, ¶ 110). Following that interview, Gateway suspended Assad, instructed him to not come to campus, and notified its security staff to alert police if Assad was seen on campus. (ECF No. 59, ¶¶ 112-14.) The investigation, which lasted until November 17, 2017, included interviews of twelve witnesses, including

3

Assad. (ECF No. 59, ¶ 116.) Assad either denied or said he could not recall having engaged in the conduct alleged by Lanning. (ECF No. 59, ¶ 117.)

Vollendorf prepared a report outlining his conclusions regarding the investigation. (ECF No. 59, ¶ 121.) "Gateway concluded that it was more likely than not that Assad subjected Lanning to unwelcome sex-based verbal statements and made unwelcome physical contact with her, which created a hostile environment for Lanning and violated Gateway's policy prohibiting Sexual Assault, Misconduct, and Harassment." (ECF No. 59, ¶ 122.) As a result, Gateway terminated Assad's employment on November 17, 2017. (ECF No. 59, ¶ 123.) Gateway informed Lanning that it had terminated Assad. (ECF No. 59, ¶ 124.) Lanning resigned from her position in late December 2017. (ECF No. 59, ¶ 136.)

Two and a half years later, on June 17, 2020, Lanning filed this lawsuit. (ECF No. 1.) In her amended complaint she alleges that Assad was her supervisor and would make "unwelcome, offensive, and harassing sexual statements to Plaintiff," "nonconsensual and violent sexual contact," and "sexual advances." (ECF No. 18, ¶¶ 117-19.) "In response to Plaintiff's refusal of Assad's unwanted sexual advances, Assad reassigned Plaintiff's work assignments," which she alleges constitutes quid pro quo sexual harassment. (ECF No. 18, ¶¶ 121-24.) She also alleges that Gateway knew or should have known of Assad's conduct but failed to take any action. (ECF No. 18, ¶ 125-32.) These actions, Lanning alleges, violated Title VII of the Civil Rights Act of 1964

(First Claim), Title IX of the Education Amendments Act of 1972 (Second Claim), and "42 U.S.C. § 1983" (Third Claim).

All parties have consented to the full jurisdiction of this court. (ECF No. 8, 9.) Gateway has moved for summary judgment as to the whole of Lanning's amended complaint. (ECF No. 22.) Lanning filed her own motion for partial summary judgment. (ECF No. 30.) The briefing on these motions is complete and each is ready for resolution.

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 3. Analysis

#### 3.1. Hostile Work Environment Claim

"A hostile work environment claim requires a plaintiff show: (1) the work environment was objectively and subjectively offensive, (2) the harassment complained of was based on gender, (3) the conduct was either severe or pervasive, and (4) a basis for employer liability exists." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627-28 (7th Cir. 2019) (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009)). For the purpose of the present motions, Gateway does not dispute the first three elements. (ECF No. 24 at 16.) Nonetheless, it argues that it is entitled to summary judgment because no basis exists for holding it liable for Assad's conduct.

##### 3.1.1. Whether Assad was Lanning's Supervisor

If the harasser is the plaintiff's supervisor, the defendant "employer is strictly liable if the harassment culminates in a tangible employment action." *Byrd v. Wis. Dep't of Veterans Affairs*, 98 F. Supp. 3d 972, 982 (W.D. Wis. 2015) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 133 S. Ct. 2434, 2439 (2013)). "'Supervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes v. Ill. DOT*, 359 F.3d 498, 506 (7th Cir. 2004); *see also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). A person is a supervisor only if he can "effect a 'significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 570 U.S. at 431 (quoting *Burlington Indus. v. Ellerth,* 524 U.S. 742, 761 (1998)).

Lanning argues that Assad was her supervisor because "he had direct control over the educational and experiential job benefits that were inherent in the Student Casual position (in addition to other supervisory functions such as control over hours worked and hiring decisions involving Student Casuals)." (ECF No. 61 at 10.) She contends that Assad could "direct and control" her "day-to-day activities" (ECF No. 64, ¶ 4) and could control her work schedule (ECF No. 64, ¶ 11), including assigning her additional work hours (ECF No. 64, ¶ 12) or denying her requests to work additional hours (ECF No. 64, ¶ 13). She also alleges that Gateway "delegated to Technicians [like Assad] the authority to make hiring decisions involving Student Casuals." (ECF No. 64, ¶ 22.)

But the evidence she cites undercuts each of her assertions. To support her assertion that Assad could "direct and control" her "day-to-day activities" (ECF No. 64, ¶ 4), Lanning cites Vollendorf's deposition. (ECF No. 52-4 at 6, 22:5-17.) But the cited testimony was merely that all of the support technicians could "assign tasks" to student casuals. (ECF No. 52-4 at 6, 22:5-17.) This was only one of many ways the student casuals would receive work assignments. (ECF No. 59, ¶ 55.) The fact that one way Lanning could receive assignments was from Assad does not demonstrate that Assad

directed and controlled her day-to-day activities. *See Vance*, 570 U.S. at 439 ("The ability to direct another employee's tasks is simply not sufficient.").

To support her assertion that Assad controlled the hours she worked, she points to various emails. Specifically, on March 8, 2017, Lanning emailed Assad and Edwards, "I am emailing in regards to my recent missed days. Marv directed me to speak with you two about making up that time. If I extend my hours Thurs, & come in for a few Friday, does that work with this week?" On March 23, 2017, Lanning wrote to the three technicians and Campbell, saying, "In order to fulfill the hours I missed on Tuesday, I will be working 2:30-7pm, tomorrow, Friday the 23rd." (ECF No. 52-5 at 3.) On August 14, 2017, Lanning sent an email (it is not clear who she sent the email to) to say she was sick and would not be able to work that day. (ECF No. 52-5 at 4.) Assad responded, "Get well Soon!!", to which she replied, "Thank you, It's appreciated! :)"  (ECF No. 52-5 at 5.) And on October 11, 2017, Lanning emailed the three technicians to say that she would not be in that day. (ECF No. 52-5 at 5.) And Lanning also refers to two emails she sent to Assad on January 16, 2017, to which she attached her timesheet for the previous four weeks. (ECF No. 52-6.) Lanning never explains why she was sent these timesheets to Assad. Doherty was the person in charge of approving Lanning's timecards. (ECF No. 63, ¶ 7.)

The fact that Lanning communicated with Assad and the other technicians when she would be absent does not establish that Assad controlled her work schedule,

including assigning her additional work hours or denying her requests to work additional hours. Employees in any workplace routinely communicate with their coworkers regarding absences and scheduling. Campbell was responsible for Lanning's schedule, although all the technicians may have been afforded some input into Campbell's scheduling decisions. (ECF No. 63, ¶ 4.) "When Lanning had questions or concerns relating to her schedule or needed to be absent from work, she contacted Campbell." (ECF No. 59, ¶ 52; *see also* ECF No. 59, ¶¶ 53-54.) The email Lanning relies on (ECF No. 52-5 at 2) confirms as much. She states that she is contacting the technicians only because Campbell instructed her to contact them to work out the details of her making up time. (ECF No. 52-5 at 2.)

Finally, as for her assertion that Gateway "delegated to Technicians the authority to make hiring decisions involving Student Casuals" (ECF No. 64, ¶ 22), she cites the deposition testimony of Campbell and Travian Franklin, another computer support technician for Gateway (ECF No. 59, ¶ 24). Campbell testified that hiring for student casuals is informal, and he interviewed Lanning because Franklin recommended her for the position. (ECF No. 52-3 at 7, 41:4-12; 11, 63:24-64:1.) Franklin merely confirmed that he recommended that his supervisors hire Lanning, and that they did so. (ECF No. 52-1 at 11, 101:6-16.) The fact that the Technology Support Coordinator considered the recommendation of another technician in hiring Lanning does not support Lanning's assertion that Gateway delegated hiring decisions to Assad. *See Byrd*, 98 F. Supp. 3d at

983 ("Boeker's participation in the panel that interviewed Byrd, and his later recommendation to Schuldes that her employment be terminated, does not elevate him to a supervisor.").

In sum, the evidence relied upon by Lanning does not come close to establishing that Assad was her supervisor. *See Andonissamy*, 547 F.3d at 848 ("directing work activities and recommending disciplinary action are not in and of themselves sufficient to make someone a supervisor under Title VII"); *Rhodes*, 359 F.3d at 506 (holding that employees were not supervisors despite managing the plaintiff's work assignments, investigating complaints and disputes, and making recommendations concerning sanctions for rule violations); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (holding that employee was not the plaintiff's supervisor despite the fact that he "(1) possessed the authority to direct her work operations (i.e., which machines she ran); (2) provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees").

A student casual may be the lowest ranking employee in Gateway's IT department, and thus it may be said that every other employee in the IT department is "superior" to them in the colloquial sense of the term. But that did not make every other employee Lanning's "supervisor" for purposes of Title VII. Lanning has failed to adduce evidence that Assad had *significant* control over her employment. He did not have control over "hiring, firing, failing to promote, reassignment with *significantly*

different responsibilities, or a decision causing a *significant* change in benefits," *Vance*, 570 U.S. at 431 (emphasis added).

Therefore, as a matter of law, Assad was not Lanning's supervisor under Title VII.

### 3.1.2.  Whether Assad had the Apparent Authority of a Supervisor

Lanning alternatively argues that Assad was her supervisor because he had "apparent authority" to terminate her employment. (ECF No. 61 at 14-17.)

"In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence. Apparent authority analysis therefore is inappropriate in this context." *Burlington Indus.*, 524 U.S. at 759. But there may be unusual circumstances in which it is reasonable for a plaintiff to believe that the harasser has the authority of a supervisor. *Id*. Lanning argues that this is such an unusual circumstance because Assad once said he "could get Jonathan fired." (ECF No. 61 at 14.) Jonathan was another student casual at Gateway. (ECF No. 65, ¶ 3.)

For Assad to say he could get someone fired is very different than saying, "I could fire him." The distinction is not mere "word games," as Lanning argues (ECF No. 61 at 15), but a material difference as to the nature of the purported power the person is professing to possess. The statement that "I could fire him" suggests that Assad alone possessed the authority; the statement that "I could get him fired" makes clear that the actual decision to terminate employment lies with someone else. This is the sort of off-

hand statement that any employee might make about a co-worker (or that could be made by essentially anyone). It does not suggest authority to terminate someone's employment so much as it suggests knowledge of a fact that, if reported, could lead the person who actually *does* possess the authority to fire the employee to terminate the employee's employment. It is in this sense that Lanning "got Assad fired" by reporting his misconduct. But it certainly could not be said that, by having knowledge of Assad's misconduct, Lanning had the apparent authority to terminate his employment.

Beyond that isolated statement, the only authority that Lanning says Assad purported to possess is that discussed above and which, as a matter of law, is insufficient to make Assad a supervisor. The undisputed evidence is that Assad's actual and apparent influence over Lanning's employment was insubstantial and thus insufficient to render him a supervisor under Title VII.

### 3.1.3. Whether Gateway Was Negligent in Discovering or Remedying the Harassment

Because Assad was merely Lanning's co-worker, Gateway is liable for his sexual harassment "only if it was negligent in discovering or remedying the harassment." *Byrd*, 98 F. Supp. 3d at 982 (citing *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012)); *see also Cole v. Bd. of Trs.*, 838 F.3d 888, 898 (7th Cir. 2016) (quoting *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004)). "[T]he plaintiff bears the burden of showing that the employer knew of the problem (usually though not always this requires the employee to show that a complaint was made) and that the employer did not act

reasonably to equalize working conditions once it had knowledge." *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373 (7th Cir. 2007) (quoting *Dunn v. Washington County Hospital*, 429 F.3d 689, 691 (7th Cir. 2005)); citing *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006) (holding that, if the harasser "is a coworker, the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory co-workers"); *see also Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) ("To prove negligence, an employee usually must make a 'concerted effort to inform the employer that a problem exists.' This would include lodging a complaint with human resources or telling high-level management about the harassment.") (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004)).

Short of the plaintiff making a complaint of harassment, an employer may be liable if it had constructive notice of the harassment. The harassment must be "sufficiently obvious" for an employer to be said to have constructive notice. *Hrobowski*, 358 F.3d at 478. Moreover, "the notice must 'come to the attention of someone who… has under the terms of his employment…a duty to pass on the information to someone within the company who has the power to do something about it.'" *Id.* (quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)).

Gateway had comprehensive and robust sexual harassment policies. (ECF No. 59, ¶¶ 8-16, 60-64.) It widely disseminated those policies (ECF No. 59, ¶¶ 4-20, 60-64)

and offered training on those policies (ECF No. 59, ¶¶ 21-22). Lanning used those policies to report prior incidents of unusual behavior from a student who made romantic advances towards her. (ECF No. 59, ¶¶ 66-81.) Gateway promptly addressed that complaint by instructing the student to stay away from Lanning. (ECF No. 59, ¶ 81.)

When Lanning reported Assad's conduct to the police, she stated that she had not reported it to anyone previously and that no one else had witnessed it because Assad was always sure to engage in the conduct only when no one else was around. (ECF Nos. 29-2 at 30, 186:12-88:25; 59, ¶ 103; *see also id.*, ¶ 104.) Nonetheless, Lanning now asserts "that Gateway had notice of the harassment, [sic] but failed to act." (ECF No. 61 at 18.) Her response to this aspect of Gateway's motion consists mostly of reciting caselaw. (ECF No. 61 at 18-19.) The only relevant facts she offers is that she "reported the harassment to two other Technicians, many of Assad's former coworkers, including fellow technicians and the [sic] Assad's supervisor, personally witnessed Assad engage in multiple acts of sexual misconduct directed at both Carissa and other students and employees at Gateway." (ECF No. 61 at 19.) But those facts are unsupported by any evidentiary citation.

But in other parts of her response and her brief in support of her own motion for summary judgment it is possible to speculate as to what Lanning may be referring. Lanning states:

On at least two separate occasions, Carissa reported Assad's harassment to Technician Felicia Edwards, stating that she felt uncomfortable around Assad, that she didn't want to be alone with him, and that Assad had said inappropriate things to her. Dkt. 60 at ¶ 7 (Lanning Dep. at 120:13-121:2; 122:6-10; *see also* Gateway's Investigation Report at GTC000972-74). Edwards had even observed Assad make an offensive remark to Carissa prior to these reports. Dkt. 60 at ¶ 7 (Lanning Dep at 121:18-25; Gateway's Investigation Report at GTC000972-74; *see also* Declaration of Carissa Lanning (Edwards also observed Assad make offensive comments about another Gateway employee)). Ms. Edwards acknowledged that she understood Carissa to mean that Assad's comments toward and about women were making Carissa uncomfortable. Dkt. 60 at ¶ 7 (Lanning Dep. 121:6-12, 18-21). Ms. Edwards even stated that she also felt uncomfortable around Assad due to Assad's comments about women. *Id.* 121:18-21.

While the harassment was ongoing, Carissa also reported the harassment to Technician Calvin Harris. Dkt. 60 at ¶ 6 (Lanning Dep. at 189:6-12, Gateway's Investigation Report at GTC000972-74 GTC000973). Harris acknowledging his understanding that Carissa was reporting misconduct, told Carissa that Assad "shouldn't be talking to her that way." *Id.* (GTC000967). Unfortunately, neither Edwards nor Harris took any action to protect Lanning, even though Lanning made her first report to Edwards in the summer of 2017. Dkt. 60 at ¶ 7 (Lanning Dep. at 120:13-121:2). Moreover, Marv Campbell personally witnessed at least two instances of Assad's sexual misconduct involving Carissa when he was present when Assad made graphic sexual remarks in her presence. *See infra* at 7-9.

(ECF No. 61 at 3-4.) Setting aside the various evidentiary problems presented by these various statements—her reliance on her own testimony to establish what another person knew or heard and the multiple hearsay issues—even if proven these facts would be insufficient to put Gateway on notice of Assad's alleged sexual harassment.

Lanning testified that in the summer of 2017 she told Edwards that Assad's "behavior made me uncomfortable." (ECF No. 52-2 at 10, 121:6-12.) She did not provide any further details but said that Edwards heard Assad when he "told me that I needed

to blend my contour better." (ECF No. 52-2 at 10, 121:13-25.) She also testified, "I would say more than one occasion I expressed my distaste for being alone with him." (ECF No. 52-2 at 11, 122:6-10.)

As for Harris, Lanning described one instance where she and Edwards were at lunch with Harris and Lanning said, "I didn't like how he talked to me." (ECF No. 52-2 at 17, 189:4-12.) Again, she did not provide any additional details. (ECF No. 52-2 at 17, 189:13-15.)

These vague statements were insufficient to put Gateway on notice that Lanning was being sexually harassed by Assad. There are countless reasons unrelated to sexual harassment as to why one employee may have a "distaste" for or be "uncomfortable" working with another employee. And there are lots of reasons why an employee may not like how another employee talks to her other than sexual harassment. In fact, Lanning alleges that Edwards knew of one possible explanation for her feelings— Assad's comment that she needed to better blend her makeup. Such a comment may have been rude but, by itself, did not constitute sexual harassment.

Lanning also argues that Campbell had constructive notice of Assad's sexual harassment because he was present during two instances where Lanning heard Assad making sexual comments about other women. In the first, Lanning alleges that Assad "was making sexual statements about a female employee wearing heels and a skirt, saying that it was like that woman wanted people to look up her skirt, and other similar

statements." (ECF No. 54.) Lanning testified that "in essence, what he was saying was that, as an instructor, it's totally inappropriate for her to wear heels whatsoever, and you want somebody to look up your [skirt] …." (ECF No. 52-2 at 16, 164:9-13.) In the second incident, "Assad was making insulting and sexual statements about another female employee's breasts." (ECF No. 54.) Specifically, Lanning testified that Assad "had responded to Student Services, and when he came back, he said that her breasts were out; and he would never allow his woman to go to work like that, and he wouldn't want to fuck her." (ECF No. 52-2 at 15, 159:22-25.) Lanning alleges that Campbell did nothing in response to this statement other than "let out a nervous chuckle." (ECF No. 54.)

Campbell did not recall either of these alleged incidents. (ECF No. 52-3 at 9, 46:19-21.) But he testified that he recalled one incident where he and Assad were in a hallway, a woman walked by, and Assad made a comment to the effect of, "Hey, did you see that?" (ECF No. 52-3 at 9, 46:9-16.) Campbell responded, "We need to keep it professional." (ECF No. 52-3 at 9, 46:18.)

Assad's alleged conduct in these three incidents was uncouth, but Title VII "is not designed to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). It does not proscribe "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Id.*; *see also Vance*, 570 U.S. at 452 ("Title VII imposes no 'general civility code.' It does not reach 'the ordinary tribulations of the workplace,' for example, 'sporadic use of abusive language' or generally boorish

17

conduct."). Even if a jury were to find that Campbell heard Assad say these things, these facts would not constitute constructive notice of Assad's alleged sexual harassment of Lanning. The statements were not pervasive and did not violate Title VII.

Finally, Lanning points to evidence that other technicians or student casuals witnessed Assad making sexual comments. (ECF No. 61 at 5-7.) However, none is alleged to have reported Assad's conduct to a supervisor. This evidence suggests merely that a variety of people occasionally witnessed Assad engage in the sort of sporadic boorish conduct that is not proscribed by Title VII. Only when viewed in the aggregate, which did not occur until Lanning complained to Gateway about Assad, is a pervasive pattern perhaps discernable. Gateway, as an institution, is not liable for failing to pull these disparate threads together sooner.

The first person to whom Lanning reported Assad's misconduct was her fiancé. This set in motion a chain of events that led to Gateway's Title IX Coordinator becoming aware of Lanning's allegations. Within a day of Lanning first telling anyone of the harassment, a Gateway official had interviewed Lanning and Gateway had suspended Assad. This prompt investigation was a reasonable corrective action. *Hunt*, 931 F.3d at 630 (quoting *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 637 (7th Cir. 2009)). When Gateway's investigation supported Lanning's allegations, it terminated Assad's employment.

Having promptly remedied the sexual harassment as soon as it became aware of it, Gateway is not liable for creating a hostile work environment. Assad did not have actual or apparent supervisory authority over Lanning, and Gateway was not negligent in failing to discover the harassment sooner.

Accordingly, Gateway is entitled to summary judgment as to Lanning's hostile work environment claim. Lanning's motion for partial summary judgment on this claim will be denied.

### 3.2. Quid-Pro-Quo Sexual Harassment Claim

Lanning alleges in her amended complaint, "Assad's reassignment of Plaintiff's work assignments constitutes Quid pro Quo harassment." (ECF No. 18, ¶ 124.) However, her EEOC complaint contained no reference or allusion to quid-pro-quo sexual harassment. (ECF No. 52-12.) Gateway argues that Lanning's quid-pro-quo claim must be dismissed because she failed to exhaust her administrative remedies. (ECF No. 24 at 22.)

"When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 503 (7th Cir. 1994). This standard is met

> if there is a reasonable relationship between the allegations in the charge
> and the claims in the complaint, and the claim in the complaint can

reasonably be expected to grow out of an EEOC investigation of the allegations in the charge…. The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals.

*McKenzie v. Ill. DOT*, 92 F.3d 473, 481 (7th Cir. 1996) (quoting *Cheek,* 31 F.3d at 501); *see*

*also Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 812 (7th Cir. 2014).

Even liberally construing the allegations in her EEOC complaint, there is nothing to suggest that Lanning was alleging quid-pro-quo sexual harassment. For example, she did not suggest that her assignments changed or even that Assad was allegedly capable of controlling her assignments. Rather, she described Assad as her "mentor" and referred to Campbell as her "supervisor." (ECF No. 52-12 at 4.)

She argues that her quid-pro-quo claim is sufficiently related to the allegations in her EEOC complaint because she alleged that "Assad's assessment of her job performance 'would have affected [her] employment status.'" (ECF No. 61 at 29 (quoting ECF No. 52-12 at 4).) Her full EEOC statement, in context, was as follows:

I first had contact with Assad my first day on the job, as he was training me in my duties and responsibilities. He taught me the computer systems, and how to troubleshoot, how to set up classrooms with computers, and other projects. He was basically my mentor, and I was in a situation where his observations of my work would be reported, and if they were not good, it would have affected my employment status. For 8 out of the 10 projects that I was assigned, I was working side by side with Assad. (Approximately 15 hours per week).

(ECF No. 52-12 at 4.)

At best this statement suggests that Assad *could* have engaged in some manner of quid-pro-quo sexual harassment by threatening to give negative reports of her work if she continued to rebuff his advances. It offers no hint that Assad ever allegedly did so. The context of this statement, following a lengthy recounting of how she allegedly never received an employee handbook, never received sexual harassment training, or was otherwise instructed about how to report sexual harassment, suggests that it is offered not as a new sort of claim but as an explanation for why she endured eight months of harassment before lodging a complaint. Although her new quid-pro-quo harassment claim involves the same person, it involves very different conduct than the verbal harassment and physically assaultive behavior that Lanning alleged in her EEOC complaint.

Because she did not include a quid-pro-quo claim in her EEOC complaint, Lanning cannot pursue it now. Summary judgment will be granted in favor of Gateway as to this claim.

### 3.3. Title IX Claim

"Title IX provides in pertinent part that, 'no person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280, 118 S. Ct. 1989, 1994, 141 L.Ed.2d 277, 285-86 (1998) (quoting 20 U.S.C. § 1681(a)). However, an educational

institution "cannot be held liable on the ground of respondeat superior for an employee's violation of the statute." *Doe v. Madison Metro. Sch. Dist.*, 897 F.3d 819, 822 (7th Cir. 2018) (quoting *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 870 (7th Cir. 2012)). "Accordingly, a Title IX plaintiff must ultimately prove that 'an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond' in a way that 'amount[s] to deliberate indifference.'" *Madison Metro. Sch. Dist.*, 897 F.3d at 823 (quoting *Gebser*, 524 U.S. at 277, 291). "To survive summary judgment, a plaintiff 'must establish a genuine issue of fact as to whether an appropriate official … had (1) actual knowledge of misconduct … that created a serious risk to its students, and (2) responded with deliberate indifference to the misconduct.'" *Id.* (quoting *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 606 (7th Cir. 2008)).

Gateway moves for summary judgment on Lanning's Title IX claim, arguing that it did not have actual notice of Assad's conduct until Lanning reported it on November 2, 2017. When it learned of the claim, it acted quickly and appropriately. (ECF No. 24 at 27-29.) (Gateway does not argue, and thus the court does not consider, whether Lanning's Title IX claim is preempted by Title VII. *See, e.g., Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 831-34 (N.D. Ill. 2015).)

Lanning responds that she has met her burden, arguing:

Marv Campbell witnessed (at least) two instances of sexual misconduct perpetrated by Assad against Lanning. Furthermore, Carissa reported the harassment to Technicians Felicia Edwards and Calvin Harris. Both Edwards and Harris also witnessed Assad engage in separate other acts of sexual misconduct in addition to their knowledge of the misconduct directed toward Carissa. Thus, Gateway had actual knowledge of Assad's sexual misconduct and propensity for sexual harassment because: 1) Marv Campbell had authority to take corrective action and he had actual knowledge of Assad's sexual misconduct; and 2) Edwards and Harris both had knowledge of Assad's misconduct and were appropriate persons as was admitted by Gateway's Corporate Representative.

(ECF No. 61 at 21.)

Gateway disputes that Campbell was an "appropriate official" for Title IX purposes and the extent to which he may have heard Assad make sexual comments. (ECF No. 46 at 13-14.) But the court finds it unnecessary to consider those arguments because, even if Campbell was an appropriate official and had witnessed all the incidents that Lanning alleges, it would not support a finding that Gateway had actual knowledge of Assad's sexual harassment of Lanning for purposes of Title IX.

Deliberate indifference in this context requires far more than mere suspicion or the possibility of impropriety. *See Madison Metro. Sch. Dist.*, 897 F.3d at 823; *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004). It requires knowledge of a risk so great that the harm is almost certain to occur if nothing is done to stop it. *Madison Metro. Sch. Dist.*, 897 F.3d at 823 (discussing *Delgado*, 367 F.3d at 672). As discussed above, a few off-color comments does not amount to sexual harassment, suggest that a person is a serial

harasser, *see Delgado*, 367 F.3d at 672 (dicta), or demonstrate a risk that he is "almost certain" to sexually assault a coworker.

No rational jury could conclude that, based on these few incidents (three at the most), Campbell had actual knowledge of such a severe risk to Lanning. *See Madison Metro. Sch. Dist.*, 897 F.3d at 824 (affirming summary judgment despite principal's knowledge that a middle school teacher would hug students, give students back and shoulder rubs, that plaintiff as a seventh grade student had kissed the teacher on the cheek, would hug him, had a seeming preoccupation with him, and would "jump and hang on him"); *St. Francis Sch. Dist.*, 694 F.3d at 872 (affirming summary judgment despite principal having received a report that plaintiff and his teacher had "'breached the line' and 'blurred the line' by treating students as friends" and "the plaintiff had something 'like an eighth grade girlfriend/boyfriend relationship,' 'like a crush,'" with his teacher).

As for Edwards's and Harris's alleged knowledge, again, the court finds it unnecessary to consider Gateway's argument that these peers of Assad were not appropriate officials under Title IX. It is sufficient to note, as the court did above, that Lanning never reported any misconduct to Edwards or Harris. Rather, she made ambiguous comments regarding her dislike for Assad. Such statements are insufficient to constitute actual notice under Title IX.

Therefore, Gateway is entitled to summary judgment as to Lanning's Title IX claim.

### 3.4. Section 1983 Claim

Lanning alleges, "The acts and omissions of Defendant described above also violates 42 USC 1983 since Defendant was a state actor when taking these actions or committing these omissions." (ECF No. 18, ¶ 144.) However, "§ 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)). Usually § 1983 is a means for asserting rights secured under the Constitution, and thus the first step is "to isolate the precise constitutional violation with which [the defendant] is charged." *Id.* at 394. (quoting *Baker*, 443 U.S. at 140). Lanning never refers to any provision of the Constitution or otherwise identifies which federal right she is asserting by way of § 1983. The court presumes that Lanning intended to allege an equal protection claim under the Fourteenth Amendment.

However, as Gateway points out, § 1983 proscribes the conduct of "persons." *See* 42 U.S.C. § 1983. Gateway is not a "person" for purposes of § 1983. *See Allen-Noll v. Madison Area Tech. Coll.*, No. 18-cv-216-slc, 2018 U.S. Dist. LEXIS 217234, at *29 (W.D. Wis. Dec. 28, 2018). Lanning does not directly address this defect in her response. Rather, she relies on *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450 (8th Cir. 2009), to

argue that Gateway is liable because it did not require employees to undergo sexual harassment training. (ECF No. 61 at 29-30.) The court in *Plamp* held, "A school district can be liable for civil-rights violations under § 1983 either for failing to receive, investigate, and act upon complaints of [unconstitutional conduct] or for failing to train its employees to prevent or terminate [unconstitutional conduct]." *Plamp*, 565 F.3d at 459 (quoting *P.H. v. Sch. Dist. of Kan. City*, 265 F.3d 653, 658 (8th Cir. 2001)).

The theory of liability that the Court of Appeals for the Eighth Circuit discussed in *Plamp* is a species of what is commonly referred to as *Monell* liability. *See Plamp*, 565 F.3d at 459 (discussing *P.H.*, 265 F.3d at 658, in turn citing *Thelma D. v. Bd. of Educ.*, 934 F.2d 929, 932 (8th Cir. 1991), in turn discussing *Monell v. City Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)). As articulated by the court in *Plamp*, to prevail on a failure-to-act claim, a plaintiff must present evidence "that (1) there was a 'continuing, widespread, persistent pattern of unconstitutional misconduct,' (2) the school's 'policymaking officials' were deliberately indifferent to or tacitly authorized such conduct after gaining knowledge of such conduct, and (3) [the plaintiff] 'was injured by acts pursuant to the … custom.'" *Plamp*, 565 F.3d at 459 (quoting *Thelma D.*, 934 F.2d at 933-34).

As discussed above, Lanning has failed to present evidence that Gateway was deliberately indifferent to Assad's sexual harassment. At best Lanning presented evidence that a mid-level manager, the Technology Support Coordinator, was aware

that on perhaps as many as three occasions Assad made unprofessional comments of a sexual nature and that Lanning made vague comments to her coworkers about disliking Assad. This is far short of a policymaking official being aware of continuing, widespread, and persistent misconduct.

Therefore, Gateway is entitled to summary judgment on Lanning's section 1983 claim.

## 4. Conclusion

There is no dispute that Lanning suffered inexcusable harassment by Assad. Although she was victimized by a Gateway employee while she was both a student and an employee there, Gateway is not liable for Assad's conduct under Title VII, Title IX, or the Due Process Clause of the Fourteenth Amendment by way of 42 U.S.C. § 1983.

The undisputed evidence is that Assad's actual and apparent influence over Lanning's employment was insubstantial and thus insufficient to render him a supervisor under Title VII. Nor was Gateway negligent in discovering Assad's misconduct. While reporting sexual victimization is often exceedingly intimidating, it is generally required for an employer to be liable for the harassment of a non-supervisory employee. Lanning's vague and ambiguous comments to her non-supervisory co-workers were insufficient. Similarly insufficient were the few isolated instances of relatively mild instances (at least when compared to what Lanning suffered) of Assad's boorish behavior that Lanning's immediate supervisor was alleged to have witnessed.

Similarly, Lanning's Title IX claim fails. At best Lanning has demonstrated that a mid-level manager may have known that on as many as three occasions Assad had made inappropriately sexual comments and Lanning made ambiguous statements of disliking Assad to his peers. Gateway's failure to act in light of these facts cannot be said to have been deliberately indifferent to a serious risk to Lanning. For the same reasons, Lanning's § 1983 "failure-to-act" claim fails.

**IT IS THEREFORE ORDERED** that Lanning's "Motion for Partial Summary Judgment" (ECF No. 30) is **denied**.

**IT IS FURTHER ORDERED** that Gateway's "Motion for Summary Judgment" (ECF No. 22) is **granted**. Lanning's complaint and this action are dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of July, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge